UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-mj-8003-RMM

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| JORGE BERNADIEL COLLAZO and | ) |
| ERNESTO VEGA, a/k/a "Cofa," | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)?  NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?  NO

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  NO

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   /s/ Alexandra Chase
ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5501746
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel: (561) 209-1011
Fax: (561) 659-4526
alexandra.chase@usdoj.gov

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>JORGE BERNADIEL COLLAZO and<br>ERNESTO VEGA, a/k/a "Cofa,"<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)           24-mj-8003-RMM<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  December 21, 2023 to present  in the county of  Palm Beach  in the Southern District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1347 | Health care fraud |

This criminal complaint is based on these facts:

Please see the affidavit of Special Agent Curtis Lee Collison III, U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG").

☑ Continued on the attached sheet.

Sworn and attested to me by applicant by telephone (FaceTime) per the requirements of Fed. R. Crim. P. 4(d) and 4.1

*Complainant's signature*

CURTIS COLLISON
Digitally signed by CURTIS COLLISON
Date: 2024.01.04 14:16:49 -05'00'

Curtis Lee Collison III, Special Agent, HHS-OIG
*Printed name and title*

Date: 01/04/2024

*Judge's signature*

City and state:  West Palm Beach, Florida       Hon. Ryon M. McCabe, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF CURTIS LEE COLLISON III
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Curtis Lee Collison III, a Special Agent of the U.S. Department of Health & Human Services, Office of Inspector General (hereinafter "OIG"), duly sworn, do hereby depose and state:

1. I am a Special Agent of the OIG assigned to the Miami Regional Office. As such, I am a law enforcement officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, and Title 42, United States Code.

2. I have been a Special Agent with the OIG for approximately nineteen years and have been assigned to the Miami Regional Office of OIG since November of 2004. As an OIG agent, I have received training in and participated in fraud investigations related to health care fraud, bank fraud, mail fraud, wire fraud, identity theft, access device fraud, money laundering, and other major organized fraud schemes against HHS departmental programs, including those involving the submission of false and/or fraudulent claims for payment by Medicare. Prior to my tenure as an OIG agent, I was employed as an Intelligence Research Specialist with the U.S. Drug Enforcement Administration for three and a half years.

3. This affidavit is submitted in support of a criminal complaint charging JORGE BERNADIEL COLLAZO and ERNESTO VEGA, a/k/a "Cofa," with health care fraud, in violation of 18 U.S.C. § 1347.

4. This affidavit is based on my personal knowledge and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained during the investigation, as well as through other means.

5.      As the affidavit is submitted for the sole purpose of establishing probable cause, I have not set forth all information known to me about this investigation. Rather, I have set forth those facts and information which I believe are sufficient to establish probable cause.

## MEDICARE PROGRAM

6.      The Medicare program is a federal health insurance program for the elderly and disabled. The United States Department of Health and Human Services ("HHS") is responsible for the administration of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is the component agency of HHS that administers and supervises the Medicare Program.

7.      Medicare covers the costs of certain medically necessary clinical treatments, medications, and medical equipment, provided that the services/medications/equipment are ordered or prescribed by a physician who certifies that these services/medications/equipment are medically necessary for the treatment of the patient. The order or prescription for the medical equipment must be personally signed and dated by the Medicare beneficiary's treating physician.

8.      Part B of the Medicare program is a medical insurance program that pays providers and suppliers, with the exception of inpatient healthcare facilities, directly for goods and services; an example of which is durable medical equipment. Durable medical equipment, also known as "DME," is equipment that is designed for repeated use and for a medical purpose, such as prosthetic limbs, back braces, knee braces, and wheelchairs. CMS has contracted with CGS Administrators, LLC ("CGS") to be the Durable Medical Equipment Medicare Affiliated Contractor ("MAC") for Jurisdiction C, which includes the State of Florida. CGS's contract responsibilities are to receive, adjudicate, process, and pay certain claims for durable medical

equipment submitted to it by Medicare beneficiaries and providers of medical services in the State of Florida.

9. DME companies, physicians, and other health care providers that seek to participate in Medicare Part B and bill Medicare for the cost of DME and related benefits, items, and services are required to apply for and receive a National Provider Identifier number ("NPI") and a Provider Transaction Access Number ("PTAN"). In the application, the provider acknowledges that to be able to participate in the Medicare program, the provider must comply with all Medicare-related laws and regulations.

10. The PTAN allows a DME company to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of DME and related health care benefits, items, and services that a DME company had supplied to beneficiaries.

11. Medicare permits DME companies to submit claims for reimbursement electronically. Each claim requires certain important information, including: (a) the Medicare beneficiary's name; (b) the Medicare beneficiary's unique identification number; (c) the name and unique NPI of the doctor or other qualified health care provider who ordered the health care benefit, item, or service that was the subject of the claim; (d) the health care benefit, item, or service that was provided or supplied to the beneficiary; (e) the billing codes for each benefit, item, or service; and (f) the date upon which the benefit, item, or service was provided or supplied to the beneficiary.

12. Under Medicare rules and regulations, DME or other related health care benefits, items, or other services must be medically necessary and ordered by a licensed doctor or other licensed, qualified health care provider in order to be reimbursed by Medicare. When electronically submitting a claim, the provider certifies that the contents of the form are true, correct, and

complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare Program.

13. Medicare, through CGS, generally pays a substantial portion of the cost of the DME or related health care benefits, items, and services that were medically necessary and ordered by licensed doctors or other qualified health care providers.

### Cooperating Defendant 1

14. Cooperating Defendant 1 ("CD-1")[1] has had an on-going relationship with an unnamed individual ("Individual 1") since on or around the end of 2019. This relationship consisted of CD-1 selling medical clinics that he had established and Individual 1 would find buyers and complete the required documentation for the sale and changes with Medicare. CD-1 and Individual 1 would then split the profits from the sale.

15. In approximately May of 2022, Individual 1 approached CD-1 with a proposition to create and sell DME companies, after which they would split the profits.

### DIAMOND MEDICAL SUPPLY LLC

16. In November 2022, Special Agents from OIG and Homeland Security Investigations ("HSI") established Diamond as an undercover business for which CD-1 would pose as the "real" owner, but the nominee owner on all corporate records would be an unaffiliated individual.

---

[1] In 2021, CD-1 was charged in the U.S. District Court Western District of Kentucky with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; six counts of health care fraud, in violation of 18 U.S.C. § 1347; four counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). He began cooperating with federal law enforcement in the hope of reducing his liability for these charges. Throughout his cooperation, I have found him to be truthful, credible, and reliable. On January 18, 2023, CD-1 pled guilty to one count of conspiracy to commit health care fraud, one count of mail fraud, and one count of money laundering. On December 15, 2023, CD-1 was sentenced to a three-year term of probation.

17. Florida Department of State records indicate that Diamond Medical Supply, LLC ("Diamond") is a Florida limited liability corporation that was organized on or about November 18, 2022, in West Palm Beach, Florida, which is within the Southern District of Florida.

18. Florida Department of State Records indicate that Diamond filed Articles of Organization on or about November 21, 2022, and identified Cooperating Source[2] as the sole member, manager, and registered agent for Diamond. Cooperating Source is an unaffiliated party who was used by law enforcement in this matter as the nominee owner. Cooperating Source is listed on the paperwork of Diamond as the owner of Diamond on paper only and has no true ownership interest in the company.

19. On or about July 18, 2023, Individual 1 submitted documentation to Medicare. Based upon the documentation submitted by Individual 1 to Medicare, as of October 20, 2023, Diamond was approved to receive a PTAN. Though the issuance of a PTAN, Diamond was eligible to bill claims to and receive payments from Medicare for medically necessary DME supplied to beneficiaries.

20. On or about September 6, 2023, during a consensually recorded conversation, CD-1 and Individual 1 had discussed the possibility of selling Diamond and splitting the profits from the sale. Individual 1 agreed to facilitate finding a buyer for Diamond.

21. On or about November 17, 2023, Individual 1 informed CD-1 during a consensually recorded conversation that Individual 1 had found a buyer for Diamond and that the prospective

---

[2] Cooperating Source began working with law enforcement as a cooperating source in this undercover operation with the expectation that the individual would be paid for his work. Although Cooperating Source does have a criminal history, Cooperating Source was not facing any criminal charges throughout the time period referenced in this affidavit. Throughout his cooperation, I have found him to be truthful, credible, and reliable. Although he has not yet been paid for his cooperation, law enforcement anticipates paying Cooperating Source for this work.

buyers wanted to inspect the Diamond facility. The identity of the buyer was not disclosed to CD-1.

22. During the period of November 17, 2023, through November 20, 2023, a series of consensually recorded telephone calls and text messages occurred between Individual 1 and CD-1 to finalize the meeting time and date for CD-1 to meet the prospective buyers at Diamond.

23. On November 20, 2023, during a consensually recorded telephone call, Individual 1 confirmed the time of the meeting to take place at Diamond and told CD-1 to remind the buyers of the purchase price and that the prospective buyers may be bringing a deposit for the purchase.

## THE HEALTH CARE FRAUD SCHEME

24. On or about November 21, 2023, during the consensually recorded meeting arranged by Individual 1, CD-1 met with COLLAZO[3] and VEGA, the prospective buyers, at the Diamond location in Palm Beach County. During the meeting, CD-1 recognized VEGA as one of the buyers. CD-1 had a previously established relationship with VEGA while CD-1 had a medical office approximately 10 years ago. COLLAZO was introduced to CD-1 as VEGA's business partner. A third, unaffiliated individual was present as the individual that VEGA and COLLAZO would put on the corporate documentation when the sale was finalized. During this meeting, CD-1 offered the option of partnering together to "work" the company. Through my training and experience, "working" the company was understood as meaning to submit fraudulent claims to Medicare. During this meeting, VEGA introduced COLLAZO as his business partner and stated that they were equal partners in their business ventures.

---

[3] COLLAZO was previously convicted of health care fraud, in violation of 18 U.S.C. § 1347, in case number 15-20427-CR-MIDDLEBROOKS. He was sentenced to a term of imprisonment of thirty months. He was released from the custody of the Bureau of Prisons on or about August 21, 2017.

6

25. On or about November 29, 2023, during a consensually recorded meeting, CD-1 met with COLLAZO and VEGA. During this meeting, it was discussed that COLLAZO and VEGA already had the infrastructure to obtain Medicare beneficiary numbers and the people to submit billing/claims to Medicare. CD-1, COLLAZO, and VEGA agreed that COLLAZO and VEGA would obtain the beneficiary information and submit claims to Medicare and that CD-1 would maintain the business, handle the "nominee" owner (Cooperating Source), and facilitate the receipt and dispersal of the proceeds. During this meeting, it was agreed that CD-1, COLLAZO, and VEGA would split the proceeds equally. In addition, COLLAZO and VEGA discussed providing CD-1 funds to give to the "dueno" (Spanish for "owner") on paper so that Cooperating Source could leave the country. They additionally discussed that CD-1 needed money for the broker's fee to Individual 1.

26. On or about November 30, 2023, during a series of consensually recorded calls and text messages, COLLAZO and VEGA requested that CD-1 open a separate bank account using the same address as the Diamond location and same signatory on the account as Diamond.

27. On or about December 1, 2023, during a series of consensually recorded telephone calls, COLLAZO and VEGA requested the username and password for the Diamond corporate email account from CD-1 for their biller to be able to check the status of claims once billing to Medicare began.

28. On or about December 1, 2023, during a consensually recorded meeting with CD-1, COLLAZO provided CD-1 with $15,000 in U.S. currency. These funds constituted an initial payment for $10,000 to Cooperating Source and $5,000 as a part of the broker fee.

29. During a series of consensually recorded calls and text messages beginning on or about December 9, 2023, through December 17, 2023, COLLAZO and VEGA repeatedly

contacted CD-1 to determine the status of the second bank account so that they could begin billing Medicare.

30. On about December 11, 2023, during a consensually recorded meeting between CD-1 and COLLAZO, COLLAZO informed CD-1 that the "old man" (understood by CD-1 as the owner on paper) was no longer needed for anything and that he should leave the country within the next 15 to 20 days. COLLAZO also provided $5,000 U.S. currency as a second installment covering the broker fee to Individual 1 for introducing CD-1, COLLAZO, and VEGA.

31. On or about December 12, 2023, Medicare approved an application for an Electronic Data Interchange Agreement ("EDI") whereby Ability Network Inc would be authorized to transmit claims submitted by Diamond to Medicare.

32. On or about December 14, 2023, Special Agents from OIG and HIS established a second undercover bank account in the name of HR Emerald Services Inc with the signatory being Cooperating Source and the address as the same as Diamond.

33. On or about December 18, 2023, during a consensually recorded text message, CD-1 notified COLLAZO that the new bank account had finally been set up and properly linked to the Diamond online banking login information.

34. On or about December 21, 2023, Diamond began to electronically submit claims for payment to the Medicare program. Between December 21, 2023, and the present, Diamond has submitted approximately 48 claims for payment to Medicare for durable medical equipment totaling approximately $1,828,170. Per Medicare rules, providers can ONLY bill Medicare for services that are medically necessary, prescribed by a participating provider and provided to a Medicare beneficiary.

35. All the claims submitted during this period used the unique NPIs of two separate physicians and approximately 48 patients' (beneficiaries') unique Health Insurance Claim Numbers ("HICN"). A HICN, also known as the patient's Medicare number, is composed of a unique string of numbers and letters assigned to one individual enrolled as a beneficiary in Medicare. Any claims received by Medicare without a referring/prescribing physician's NPI and a valid beneficiary's HICN are denied payment.

36. The NPI of the physicians was used to identify the physician who allegedly examined and prescribed the durable medical equipment billed to Medicare for the beneficiary identified in the claims. Both of the physicians whose NPIs were used in the approximately 48 claims submitted for Diamond have submitted sworn attestations to investigators, in which each physician denied having seen or treated any of the beneficiaries who Diamond listed as having received services from these physicians. Both physicians also denied having prescribed durable medical equipment to any of the beneficiaries identified in the claims attributable to them that were submitted by Diamond.

37. The two alleged prescribers of items billed by Diamond account for 100% of the claims submitted by Diamond. As previously stated, neither alleged prescribing physician has ever treated any of the beneficiaries billed for by Diamond. Both prescribers also deny ever having prescribed any DME for the beneficiaries billed by Diamond.

## CONCLUSION

Based upon my investigation and the above stated information, I have probable cause to believe that from on or about December 21, 2023, through the present, JORGE BERNADIEL

COLLAZO and ERNESTO VEGA, a/k/a "Cofa," committed health care fraud, in violation of

18 U.S.C. § 1347.

Further Affiant Sayeth Naught

CURTIS COLLISON
Digitally signed by CURTIS COLLISON
Date: 2024.01.04 14:17:23 -05'00'

Curtis Lee Collison III, Special Agent
U.S. Dept. of Health & Human Services OIG

Subscribed and sworn to me by applicant
by telephone (FaceTime) per the requirements of
Fed. R. Crim. P. 4(d) and 4.1
this 4 day of January, 2024.

_____
HON. RYON M. MCCABE
UNITED STATES MAGISTRATE JUDGE

10